52

*Thos. S. Buzbee* and *Edward L. Wright,* for appellant.

*Kenneth Coffelt* and *J. H. Lookadoo,* for appellee.

McFADDIN, J. Appellee, as administrator, filed action against appellants for damages for alleged negligent killing of appellee's intestate. From a jury verdict and judgment thereon for ten thousand dollars, there is this appeal presenting the questions herein discussed.

I. *Sufficiency of Evidence to Support Verdict.*

At the close of plaintiff's evidence, and again at the close of all the evidence, the defendants moved for an

instructed verdict; and now assign as error the denial of these motions by the court. This assignment necessitates a review of the facts, and in the light most favorable to the appellee. (See *Arkansas Power & Light Co.* v. *Connelly,* 185 Ark. 693, 49 S. W. 2d 387.)

On January 16, 1943, at about four p.m., on a clear day, the deceased, Vera Caple (aged seven years, five months, and three days), with her companion of about the same age, was walking westerly on appellant's railroad track, as the public seemed accustomed to do. She caught her foot in a cattle guard. Twenty-two feet west of where she was caught, there was a road crossing; and eight hundred and two feet west of where she was caught there was a sharp curve to the south in the railroad track and a high earthen bank on either side, so that the view of the cattle guard was obstructed —at eight hundred and two feet and beyond—to the engineer or other operative of any train approaching the cattle guard from the west; that is, the distance of observability of the engineer on the train to the cattle guard was at least eight hundred and two feet. The deceased was wearing a bright red hood and coat. While she was thus caught in a cattle guard, a train traveling at a speed of twenty-five to thirty-five miles per hour came around the curve eight hundred and two feet away and proceeded to strike the deceased, knocking her body several feet from the track. She was unconscious at all times from the moment she was struck until her death which occurred less than an hour later. The plaintiff alleged the negligence of the defendants to be the violation of § 11144 of Pope's Digest, which is commonly known as the "Lookout Statute," and which statute, *inter alia,* requires the operatives of all trains to keep a constant lookout and to exercise reasonable care to prevent injuring any persons discovered in peril on the tracks.

The plaintiff introduced evidence that before the train came around the curve and all times thereafter the deceased and her companion were screaming and waving to the train in every effort to cause it to stop; and one

witness nine hundred feet away from the cattle guard saw and appreciated the danger of the child before the train came around the curve: so the engineer on the train, if he had been keeping a lookout, could have likewise appreciated the situation. The plaintiff showed that a man standing on the south rail of the railroad track eight hundred and two feet west of the cattle guard could see the place where the child was struck.

The engineer on the train testified that the front of the train was "between six hundred and seven hundred feet" west of the cattle guard when he first saw the child; and that the train went "between two hundred or three hundred feet" after striking the child. Although the engineer testified that he was at all times keeping a lookout and that he did all that he could to stop the train after discovering the child on the track, still the jury could have found (by using the minimum figures of his testimony) that he stopped the train within eight hundred feet after seeing the child. Since the engineer could have seen her at least eight hundred and two feet away, the jury might have reasonably concluded from the engineer's evidence that, if he had been keeping a lookout when he rounded the curve, he could have stopped the train two feet before reaching the child—even using his own figures on distance. But there was other evidence: one witness said the train did not slacken its speed until after it struck the child. Another witness (offered by the defendants) said the *train* (not the engine only) was "clear of the cut" when the brakes were first applied. This evidence would mean that the engine and all five passenger cars had completely rounded the curve before the brakes were applied.

So, without reviewing all the evidence we reach the conclusion that there was sufficient evidence to take the case to the jury on the lookout statute. Some of our cases construing this statute are listed in the footnote to said § 11144 of Pope's Digest and there is no need for us to list them here.

II. *Plaintiff's Instruction No. 4.*

This reads as follows: "You are instructed that if you find from a preponderance of the evidence in this

case that the defendant, W. L. Martins was operating one of the defendant railway company's trains, approaching a crossing at the time and they came through a cut that the defendants had caused to be in a hill, and that this obstructed the view of the operators of the train from the crossing some 800 feet away, and you further find by a preponderance of the evidence that the operators of the train were operating said train at such a rate of speed that they could not stop the train by the time they got to the crossing, and you further find by a preponderance of the evidence in this case that this failure on their part of not having the train under such control to stop it by the time they got to the crossing was the cause of the train striking and killing Vera Virginia Caple, you are told that you can take this into consideration in passing upon whether or not the defendants were guilty of negligence.''

W. L. Martins was the engineer on defendant's train. It will be recalled that there was a public crossing twenty-two feet west of the cattle guard; and that the train had to pass the crossing before reaching the cattle guard. In the above instruction the court in effect told the jury that if the train was running so fast that, after rounding the curve, the train could not be stopped at the crossing, then the jury could consider that fact in passing on the question of negligence in the case at bar. This instruction thus argued to the jury that if the train was running so fast that the engineer could not stop the train at the crossing then he might not have been able to have stopped it at the cattle guard where the deceased was fastened. Certainly to discuss the duty of the railroad company to someone at a public crossing between the cattle guard and the curve was to inject a most argumentative issue into the case. We hold that this instruction as given was argumentative and misleading and highly prejudicial. See 64 C. J. 660 and West's Arkansas Digest, ''Trial,'' Key No. 240. Specific exceptions were saved which bring these errors before us.

The case at bar was not a crossing case, because the deceased never reached the crossing. The deceased, in walking along the track was at most a licensee, and the

duty that the operatives of the train owed her was measured by the lookout statute. This point was discussed and explained in *St. Louis-S. F. Ry. Co.* v. *Williams*, 180 Ark. 413, 21 S. W. 2d 611. The question in the case at bar was not what the train operatives might have done regarding someone on the crossing, but what they did, or failed to do, regarding this child with her foot fastened in the cattle guard. They owed her the duty stated in the lookout statute; and to instruct about the crossing was clearly erroneous and prejudicial. This error in giving plaintiff's instruction No. 4 was emphasized and reiterated when the court amended the defendants' instruction No. 2 over defendants' objections.

### III. *Plaintiff's Instruction No. 5.*

This instruction reads: ''You are instructed that if you find for the plaintiff in this case, in assessing the damages you may take into consideration the mental suffering and fright the plaintiff's intestate suffered before the train actually struck her, but after she saw the train coming, provided you find from the preponderance of the evidence in this case that plaintiff's intestate did see the train coming and was frightened thereby.''

The evidence shows that the deceased lived only a short time after being struck by the train; and there is no allegation or proof of any conscious pain or suffering after the injury. By this instruction the jury was permitted to award damages for mental suffering *before* the injury. The instruction uses the words ''mental suffering and fright'' but in this case *fright* was but another form of mental suffering (15 Am. J. 607); so we come to the question of whether there can be a recovery for mental suffering *antecedent* to the physical injury or only for mental suffering *following or resulting* from the injury. To discuss the question necessitates a cataloguing of some of the cases:

A. Where the action is wanton or willful there may be a recovery for humiliation and mental suffering without any physical injury. Such cases are *Erwin* v. *Milligan*, 186 Ark. 658, 67 S. W. 2d 592; *Rogers* v. *Williard*, 144 Ark. 587, 223 S. W. 15, 11 A. L. R. 1115; *Lyons* v.

*Smith,* 176 Ark. 728, 3 S. W. 2d 982. But the case at bar is not such a case as any of these, for the liability here was predicated on negligence as distinguished from willful or wanton wrong.

B. In cases of negligence (or as said in one case, "unintentional negligence") where there is no willful or wanton wrong then there can be no recovery for mental suffering unless there is also physical injury. Some of these cases are *St. Louis, etc., Ry. Co.* v. *Bragg,* 89 Ark. 402, 64 S. W. 226, 86 Am. St. Rep. 206; *St. Louis, etc., Ry. Co.* v. *Taylor,* 84 Ark. 42, 104 S. W. 551, 13 L. R. A., N. S., 159; *Chicago, etc., Ry. Co.* v. *Moss,* 89 Ark. 187, 116 S. W. 192. It will be noticed that some of these cases say, there can be no recovery for mental suffering unless accompanied by physical injury. The question now posed in the case at bar is whether the mental suffering may immediately precede the physical injury and none of these cases decides that question.

C. There are cases (from other jurisdictions) which hold that where one is frightened and faints and is injured in falling, there may be a recovery for the injury resulting from the fright. See *Comstock* v. *Wilson,* 257 N. Y. 231, 177 N. E. 431, 76 A. L. R. 676, and see annotation in 11 A. L. R. 1119, 40 A. L. R. 983 and 76 A. L. R. 681. But in the case at bar there is no claim that the fright caused the injury, so these cases afford us no guide.

D. We have several cases where fright or mental anguish was allowed as an element of recovery, but in each of these there was a preceding eviction, or a derailing of the car, or some other preceding wrong which was complete and consummate before the mental anguish began. Some of these cases are *Arkansas Motor Coaches* v. *Whitlock,* 199 Ark. 820, 136 S. W. 2d 184; *St. Louis, etc., Ry. Co.* v. *Brown,* 97 Ark. 505, 134 S. W. 1194; *Lamden* v. *St. Louis S. W. Ry. Co.,* 115 Ark. 238, 170 S. W. 1001; *St. Louis, etc., Ry. Co.* v. *Robertson,* 103 Ark. 361, 146 S. W. 482; *Stevenson* v. *John J. Grier Hotel Co.,* 159 Ark. 44, 251 S. W. 355. But in the case at bar, it may be stated that if the train had stopped two feet or two inches

before striking the child there could have been no recovery for her mental anguish or fright. The violation of the lookout statute was not a *"fait accompli"* until the child was struck, so the case at bar is thereby distinguished from these cited cases.

Without further cataloguing of cases we may state that in the excellent briefs of learned counsel of both sides, and also in our own search, we have been unable to find a case of similar facts (involving only antecedent mental anguish) either in this or any other jurisdiction to serve as a guidepost in this case. *McDermott* v. *Severe,* 202 U. S. 600, 26 S. Ct. 709, 50 L. Ed. 1162, was a case of a child injured by reason of being caught in the track, but the question of mental anguish preceding the injury was not there involved. General statements may be found in the following cases and texts, to-wit: *Bahr* v. *Northern Pacific Ry. Co.,* 101 Minn. 314, 112 N. W. 267; *Hunter* v. *Fleming* (Mo.), 7 S. W. 2d 749; *McCardle* v. *Geo. B. Peck Co.,* 271 Mo. 111, 195 S. W. 1034; *Cook* v. *Maier,* 33 Cal. App. 2d 581, 92 Pac. 2d 434. Annotation in 23 A. L. R. 361 and White on "Personal Injuries on Railroads," vol. 1, § 171. See, also, 15 Am. J. 513 and annotation in L. R. A. 1916C 973. But in none of these do we find a set of facts stated that is similar or analogous to the situation in the case at bar. We must, therefore, approach the decision by citation and discussion of basic authorities, and reasoning from them.

The question may be simplified by stating it thus: "Is it the mental anguish that flows from the *negligent* act, or is it the mental anguish that flows from the *injury,* that is compensable?" We reach the conclusion that it is the mental anguish that flows from the *injury* and not the mental anguish preceding the injury that may be recoverable, in a case like the one at bar.

In the case of *St. Louis, etc., Ry. Co.* v. *Taylor,* 84 Ark. 42, 104 S. W. 551, 13 L. R. A., N. S., 159, Mr. Justice McCulloch, speaking for the court, said:

"The reason that mental suffering, unaccompanied by physical injury, is not considered as an element of

recoverable damages is that it is deemed to be too remote, uncertain and difficult of ascertainment; and the reason that such suffering is allowed as an element of damages, when accompanied by physical injury, is that the two are so intimately connected that both must be considered because of the difficulty in separating them. 4 Sutherland on Damages, § 1245; *Fell* v. *Rich Hill Coal Mining Co.*, 23 Mo. App. 216; *Chapman* v. *Western Union Telegraph Co.*, 88 Ga. 763, 15 S. E. 901, 17 L. R. A. 430, 30 Am. St. Rep. 183; *Johnson* v. *Wells, Fargo & Co.*, 6 Nev. 224, 3 Am. St. Rep. 245; *Wyman* v. *Leavitt,* 71 Me. 227, 36 Am. Rep. 303; *Ewing* v. *Pittsburg, etc., Ry. Co.*, 147 Pa. 40, 23 Atl. 340, 14 L. R. A. 666, 30 Am. St. Rep. 709.

" 'So far as mental suffering originating in physical injury is concerned,' says Judge Lumpkin in the Georgia case cited above, 'it is rightly treated as undistinguishable from the physical pain. On ultimate analysis, all consciousness of pain is a mental experience, and it is only by reference back to its source that one kind is distinguished as mental and another as physical. So, in case of physical injury, the mental suffering is taken into view. But, according to good authorities, where it is distinct and separate from the physical injury, it can not be considered'."

In *Chicago, etc., Ry. Co.* v. *Mizell*, 118 Ark. 153, 175 S. W. 396, the train was flagged and did not stop, and the plaintiffs did not get to a funeral on time, and had to walk in the rain and became sick. They were denied recovery for mental anguish by this court, and in language as follows: "Mental anguish was not a recoverable element of damages under the facts of this case. The mental anguish suffered in this case did not result from the walk in the rain and cold, nor from the sickness which resulted therefrom; but from the delay in getting to Malvern in time to look after the funeral arrangements of the father on the part of two of the appellees and the failure to attend the funeral of an uncle on the part of the other. It is true appellees suffered physical pain as the result of their illness and mental anguish on account of the delay; but there is no such

casual connection between the two as that the railway must respond in damages for both.''

In 15 Am. J. 594, in speaking of a recovery of mental anguish it is said: ''It (mental anguish) must result directly from, or be the natural, legitimate, and proximate consequence of the physical injury forming the basis of the action.''

And in 25 C. J. S. 552 the rule is stated: ''Mental pain and suffering as a direct and necessary consequence of a physical injury is a distinct element of damages. . . . The mental pain for which compensation may be had under this rule, however, must be such as accompanies the physical injury and is fairly and reasonably the natural consequence which flows from it.''

It will be observed that in all of these authorities it is stated that the mental suffering must follow and flow from the injury.

An analysis of our statutes strengthens our views that the action for mental anguish of the deceased cannot be brought under the sections that are now 1277 and 1278 of Pope's Digest was decided in *St. Louis, etc., Ry. Co.* v. *Robertson,* 103 Ark. 361, 146 S. W. 482; and see, also, *Smith* v. *Mo. Pac. Rd. Co.,* 175 Ark. 626, 1 S. W. 2d 48. The only cause of action that the administrator has for mental suffering is that allowed by § 1273 of Pope's Digest. At common law a cause of action for mental anguish ceased on the death of the injured party and it is only by reason of § 1273 of Pope's Digest that this administrator can maintain this suit. This section reads: ''For wrongs done to the person or property of another, an action may be maintained against the wrongdoers, and such action may be brought by the person injured, or, after his death, by his executor or administrator against such wrong-doer, or, after his death, against his executor or administrator, in the same manner and with like effect in all respects as actions founded on contracts.''

No wrong was done the deceased until she was injured. This statute uses the words ''the person injured.''

It does not say "the person against whom there was a negligent action." So the statute, under which this action is brought, does not provide for an action for mental suffering antecedent to the injury, in a case like the one at bar.

We therefore reach the conclusion that plaintiffs instruction No. 5 was erroneous, in allowing *mental anguish preceding the injury* to be considered as an element of damages.

IV. *Excessive Verdict.*

The appellant claims that the verdict of $10,000 was grossly excessive and in this we agree. Some of our cases on the size of verdicts that we will sustain in cases like the one at bar are *Arkansas Baking Co.* v. *Wyman,* 185 Ark. 310, 47 S. W. 2d 45; *Davis* v. *Gillin,* 188 Ark. 523, 66 S. W. 2d 1057, and see other cases listed in West Arkansas Digest, "Death," Key No. 99 (3). The size of the verdict in the case at bar was probably influenced by plaintiff's instruction No. 5 which we have heretofore discussed.

Ordinarily in a case of excessive verdict the error may be cured by a remittitur, where the excessive verdict is the only error. See *Mo. Pac. R. R. Co.* v. *Newton,* 205 Ark. 353, 168 S. W. 2d 812. But in the case at bar there was not only the error in plaintiff's instruction No. 5, but there were also the errors (a) in giving plaintiff's instruction No. 4, and (b) in modifying defendant's instruction No. 2; and these last mentioned errors go to the question of *liability;* so the excessive verdict can not be cured by a remittitur.

It therefore follows that for the errors indicated the judgment is reversed, and the cause is remanded for a new trial.